PALMER, J.
**95 The sole issue presented by this appeal is whether the trial court deprived the defendant, Ernest Harris, of his right to due process under the federal and state constitutions when it denied his motion to suppress an out-of-court and subsequent in-court identification of him by an eyewitness to the crimes of which the defendant was convicted. The defendant was charged with felony murder and first degree robbery, among other crimes, after he and an accomplice, Emmitt Scott, allegedly robbed Ruben Gonzalez (victim) and Jose Rivera at gunpoint and Scott shot and killed the victim. The trial court denied the defendant's pretrial motion to suppress an identification that Rivera had made of the defendant while the defendant was being arraigned in an unrelated robbery case, as well as any in-court identification that Rivera might later be asked to make of the defendant. Following a trial, the jury found the defendant guilty of one count each of felony murder and conspiracy to commit robbery in the first degree, and two counts of robbery in the first degree.[1]
*123 On appeal,[2] the defendant claims that the trial court violated his due process rights under the federal constitution[3] by denying his motion to suppress Rivera's out-of-court and in-court identifications of him because, contrary to the conclusion of the trial court, the former was the product of an unnecessarily suggestive procedure and neither was reliable. The defendant further claims that, even if the state's use of Rivera's out-of-court and in-court identifications did not violate his **96 due process rights under the federal constitution, the admission of those identifications violated his due process rights under the state constitution, which, the defendant contends, are more protective than his federal due process rights. Although we agree with the defendant that the out-of-court identification procedure was unnecessarily suggestive, we also conclude that Rivera's identification of the defendant was nevertheless sufficiently reliable to satisfy federal due process requirements. Accordingly, for purposes of the federal constitution, the defendant was not entitled to suppression of those identifications. We further conclude that the due process guarantee of the state constitution in article first, § 8,[4] provides somewhat broader protection than the federal constitution with respect to the admissibility of eyewitness identification testimony but that, in the present case, the trial court's failure to apply the state constitutional standard that we adopt today was harmless because the court reasonably could not have reached a different conclusion under that more demanding standard. We therefore affirm the judgment of the trial court.
The following facts and procedural history are relevant to our resolution of the defendant's claims.[5] After working together during the night shift at a warehouse in the town of Newington, the victim drove Rivera back to Rivera's home in the Fair Haven section of the city of New Haven, arriving at about 3 a.m. on July 31, 2012. The victim and Rivera were rolling a blunt in the victim's car when the defendant and Scott approached on either side of the vehicle. Scott, who was standing on the passenger side, demanded that Rivera roll down the **97 window, and both the victim and Rivera were then ordered out of the car. The victim and Rivera initially refused to exit the car but did so after Scott struck Rivera on the head with his gun. After the defendant and Scott searched the victim and Rivera for cash and valuables, the defendant rummaged through the car's interior for two to three minutes, during which Scott kept his gun pointed at Rivera. When the defendant found $600 and a cell phone in the center console, he said "[b]ingo," and he and Scott began to walk away. As they were leaving, the victim shouted from behind them, "I'll remember your face," whereupon Scott turned and shot the victim twice, killing him. The entire incident lasted approximately ten minutes. *124 Jeffrey King, an officer with the New Haven Police Department (department), was the first officer on the scene, arriving at approximately 3:30 a.m. At that time, Rivera provided King with a description of the shooter, Scott. With respect to the lighting, the crime scene was so well lit by nearby streetlamps and house lights that King did not need to use a flashlight in connection with his investigation, despite the early morning hour.
Rivera was then taken from the crime scene to police headquarters, where he was interviewed by Detective Nicole Natale. At that time, Rivera described the shooter's accomplice-who had been standing on the driver's side of the vehicle and whom he would later identify as the defendant-as an African-American male with a thin build, approximately six feet, one inch, or six feet, two inches, in height, approximately twenty-six or twenty-seven years old, with short cropped hair, and as wearing a white t-shirt and blue jeans.
Eight days later, on August 8, 2012, after learning that Scott was a suspect in several Fair Haven robberies, Natale performed a sequential photographic lineup for Rivera that included Scott's photograph. Rivera failed to identify Scott as one of the assailants. Later that day, **98 a fingerprint found on the front driver's side door of the victim's car was identified as belonging to the defendant. Although Natale used the fingerprint to obtain a photograph of the defendant through a police database, she never presented the defendant's photograph to Rivera in a lineup procedure or otherwise. On August 10, 2012, a fingerprint found on the front passenger's side door of the victim's car was identified as belonging to Scott.
Thereafter, the police learned that both the defendant and Scott were due to be arraigned on unrelated charges in court in New Haven on August 13, 2012. Robert Lawlor, an inspector with the state's attorney's office in the judicial district of New Haven, accompanied Rivera to the courthouse on that day so that Rivera could observe the arraignments and possibly identify the two men who had accosted him and the victim. Although Lawlor knew that the defendant and Scott were to be arraigned, he did not inform Rivera of that fact, and he never made Rivera aware of the defendant's name. The defendant and Scott were among fourteen arraignees who were being detained pending arraignment; the other twenty arraignees who appeared that day had not been in custody prior to their arraignment. Lawlor and Rivera both sat in the front row of the courtroom's public gallery, with Lawlor seated six seats away from Rivera. From his vantage point, Rivera watched the defendant, Scott, and the twelve other custodial arraignees-all of them handcuffed and surrounded by marshals-enter the courtroom single file through a door located only five feet away from him. Rivera recognized the defendant and Scott "as soon as they walked through the door."[6] Once he was outside **99 the courtroom, Rivera told Lawlor with "[n]o hesitation" that he was "100 percent positive those are the two suspects .... I will never forget it." Lawlor responded that, in fact, they "may be" the suspects, at which point the two men left the courthouse.
Prior to trial, the defendant moved to suppress Rivera's identification of him at *125 the arraignment proceeding and any subsequent identification that he might be asked to make of the defendant at trial. The trial court held a hearing on the motion and denied it in an oral ruling the following day, concluding that the arraignment identification procedure was not unnecessarily suggestive. At trial, Rivera testified and identified the defendant as the driver's side assailant.
In a supplemental memorandum of decision issued after the trial, the court reiterated its finding that the identification procedure was not unnecessarily suggestive because, of the thirty-four total arraignees, fifteen were African-American males, which matched the description Rivera gave to Natale the morning of the murder. The trial court also supplemented its oral ruling with a finding that, even if the identification procedure was unnecessarily suggestive, the identification itself was reliable under the totality of the circumstances. In support of this conclusion, the trial court observed the following: Rivera had approximately ten minutes to observe the assailants during the commission of the crimes; the area was well illuminated despite the late hour, and the assailant's face was not covered; the car's interior dome light shone on the assailant's face while he searched inside the car; Rivera was only a few feet from the assailant and had a clear view of him; Rivera was not under the influence of drugs or alcohol at the time of the incident and otherwise was alert and attentive during the commission of the crime; Rivera's description of the assailant was specific in regard to his approximate age, height, weight, hairstyle, skin tone **100 and clothing; Rivera was 100 percent certain that the defendant was one of the perpetrators; and the length of time between the crime and Rivera's identification of the defendant was only about two weeks.
I
The defendant first claims that the trial court's denial of his motion to suppress Rivera's in-court and out-of-court identifications violated his due process rights under the federal constitution because they both were the product of an unnecessarily suggestive arraignment identification procedure and were not reliable under the totality of the circumstances. The state contends that the trial court properly admitted Rivera's identification testimony after correctly determining that the identification procedure at issue was not unduly suggestive and that, even if, contrary to the trial court's finding, that procedure was impermissibly suggestive, Rivera's identification of the defendant at the arraignment proceeding was nonetheless reliable under all of the circumstances. We agree with the defendant that the procedure that the state used to obtain Rivera's identification of the defendant was unnecessarily suggestive. We also conclude, however, that that identification was reliable under all of the relevant circumstances and, consequently, that it was admissible and did not require the suppression of Rivera's in-court identification of the defendant.
A
At the outset, we briefly summarize the well established legal principles that govern our analysis of the defendant's federal constitutional claim. "In the absence of unduly suggestive procedures conducted by state actors, the potential unreliability of eyewitness identification testimony ordinarily goes to the weight of the evidence, not its admissibility, and is a question for the jury. See [e.g.]
**101 Perry v. New Hampshire , 565 U.S. 228, 248, 132 S.Ct. 716, 181 L.Ed. 2d 694 (2012)...."
*126 State v. Dickson , 322 Conn. 410, 419, 141 A.3d 810 (2016), cert. denied, --- U.S. ----, 137 S.Ct. 2263, 198 L.Ed.2d 713 (2017)."A different standard applies when the defendant contends that an in-court identification followed an unduly suggestive pretrial identification procedure that was conducted by a state actor. In such cases, both the initial identification and the in-court identification may be excluded if the improper procedure created a substantial likelihood of misidentification. [See] Perry v. New Hampshire , supra, at [238-39, 132 S.Ct. 716]." State v. Dickson , supra, at 420, 141 A.3d 810.
The test for determining whether the state's use of an unnecessarily suggestive identification procedure violates a defendant's federal due process rights derives from the decisions of the United States Supreme Court in Neil v. Biggers , 409 U.S. 188, 196-97, 93 S.Ct. 375, 34 L.Ed. 2d 401 (1972), and Manson v. Brathwaite, 432 U.S. 98, 113-14, 97 S.Ct. 2243, 53 L.Ed. 2d 140 (1977). As the court explained in Brathwaite , fundamental fairness is the standard underlying due process, and, consequently, "reliability is the linchpin in determining the admissibility of identification testimony ...." Id., at 114, 97 S.Ct. 2243. Thus, "the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the totality of the circumstances." (Internal quotation marks omitted.) State v. Marquez , 291 Conn. 122, 141, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S.Ct. 237, 175 L.Ed. 2d 163 (2009). Furthermore, "[b]ecause the issue of the reliability of an identification involves the constitutional rights of an accused ... we are obliged to examine the record scrupulously to determine whether the facts found are adequately **102 supported by the evidence and whether the court's ultimate inference of reliability was reasonable." (Internal quotation marks omitted.) State v. Ledbetter , 275 Conn. 534, 547, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S.Ct. 1798, 164 L.Ed. 2d 537 (2006) Nevertheless, "[w]e will reverse the trial court's ruling [on evidence] only [when] there is an abuse of discretion or [when] an injustice has occurred ... and we will indulge in every reasonable presumption in favor of the trial court's ruling.... Because the inquiry into whether evidence of pretrial identification should be suppressed contemplates a series of [fact bound] determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error." (Internal quotation marks omitted.) Id., at 548, 881 A.2d 290. Finally, the burden rests with the defendant to establish both that the identification procedure was unnecessarily suggestive and that the resulting identification was unreliable. State v. Ortiz , 252 Conn. 533, 553, 747 A.2d 487 (2000).
B
Mindful of these principles, we first consider whether the trial court correctly determined that the identification procedure that the state used in the present case was not unnecessarily suggestive. We previously have acknowledged the potential for suggestiveness that inheres in arraignment identification procedures generally. See, e.g., State v. Payne , 219 Conn. 93, 107, 591 A.2d 1246 (1991) ("we recognize the potential for suggestiveness inherent in an arraignment identification"); State v. Hinton , 196 Conn. 289, 295, 493 A.2d 837 (1985) ("we have recognized that an arraignment identification may be 'suggestive' "); see also *127 State v. Ledbetter , 185 Conn. 607, 613, 441 A.2d 595 (1981) ("[t]he mischief involved in the arraignment observation is the real possibility that the victim of one crime, armed with the **103 knowledge that the suspect is being charged with another crime, possibly of the same character, is more likely to leap to the conclusion that the person being arraigned in front of him committed both crimes").[7] Although arraignment identification procedures are not invariably so suggestive as to be per se impermissible; see, e.g., State v. Hinton , supra, at 295-97, 493 A.2d 837 ; we are persuaded that the procedure employed in the present case was unnecessarily suggestive.
Courts must consider two factors in determining whether an identification resulted from an unnecessarily suggestive procedure.[8] "The first factor concerns the composition of the [identification procedure] itself. In this regard, courts have analyzed whether the [subjects] used were selected or displayed in such a manner as to emphasize or highlight the individual whom the police believe is the suspect." State v. Marquez , supra, 291 Conn. at 142-43, 967 A.2d 56. Of course, whatever procedure is utilized, the state is not required to ensure that the defendant and the others who comprise the array look exactly alike; what is required, rather, is that the array does not single out the defendant from the others. See id., at 161-63, 967 A.2d 56 ; see also State v. Taylor , 239 Conn. 481, 499-500, 687 A.2d 489 (1996) ("there exists no constitutional mandate that gives the defendant the right to a photographic array of look-alikes"), cert. denied, 521 U.S. 1121, 117 S.Ct. 2515, 138 L.Ed. 2d 1017 (1997) ; State v. Vaughn , 199 Conn. 557, 564, 508 A.2d 430 ("[a]ny array composed of different individuals must necessarily contain certain differences"), cert. denied, **104 479 U.S. 989, 107 S.Ct. 583, 93 L.Ed. 2d 585 (1986). "The second factor, which is related to the first but conceptually broader, requires the court to examine the actions of law enforcement personnel to determine whether the witness' attention was directed to a suspect because of police conduct.... In considering this [factor, the court should] look to the effects of the circumstances of the pretrial identification, not whether law enforcement officers intended to prejudice the defendant."[9] (Internal quotation marks omitted.) State v. Marquez , supra, at 143, 967 A.2d 56.
With respect to the first prong of the test, we disagree with the trial court's conclusion that the arraignment procedure was not unnecessarily suggestive because that conclusion was based on a clearly erroneous factual finding. Specifically, the trial court found that the composition of the corporeal array[10] was not unnecessarily *128 suggestive because, of thirty-four total arraignees, fifteen of them matched Rivera's description of the driver's side assailant with respect to race (African-American) and gender (male). The court's conception of the array as consisting of the thirty-four arraignees, however, was significantly broader than the actual, operative array from which Rivera identified the defendant.
Rivera testified that Lawlor told him that "we may have suspects in the court" and that "there's going to be a group of guys coming out, and let me know if you can identify somebody that is coming out those doors ."
**105 (Emphasis added.) Indeed, as we have explained, when Lawlor brought Rivera into the arraignment courtroom, he directed Rivera to sit in the front row of the gallery to ensure that he had a clear and unimpaired view of the door through which the custodial arraignees would be entering. Thus, even if we were to assume that all twenty noncustodial arraignees were in the courtroom and identifiable as arraignees during the period of time that Rivera himself was in the courtroom, it is apparent that they only could have been seated next to or behind Rivera and that they were not among the group of arraignees entering the courtroom through the door to which Rivera's attention had been directed. Furthermore, although the testimony conflicted as to how many arraignments Rivera and Lawlor actually observed, there simply is no evidence from which to conclude that they were present for the arraignment of any of the noncustodial arraignees who were African-American males.[11] We conclude, therefore, that the trial court incorrectly treated the array as being comprised of all thirty-four arraignees. The proper starting point for the trial court's analysis of the composition of the array, rather, should have been the fourteen custodial arraignees, only nine of whom were African-American males.[12]
**106 *129 The defendant claimed before the trial court that none of those fourteen custodial arraignees was an appropriate filler. In support of this contention, the defendant adduced the testimony of Jennifer Dysart, a psychology professor at John Jay College of Criminal Justice and a recognized expert in the field of eyewitness identification. Dysart opined that all of the arraignees were inappropriate fillers due to the marked dissimilarities between each of those arraignees and Rivera's original description of the driver's side assailant as a thin, African-American male, approximately six feet, one inch, or six feet, two inches, tall, and about twenty-six or twenty-seven years old. Dysart ruled out female and non-African-American arraignees, leaving nine custodial arraignees who were African-American males. Dysart then eliminated those remaining nine arraignees, either because they were as much as six inches shorter than the person whom Rivera described as the suspect, weighed far more than the suspect, or were significantly older than the suspect. Relying on Dysart's testimony, the defendant renews his claim that the array was manifestly inadequate.
**107 The state does not seriously challenge this aspect of Dysart's testimony or otherwise contend that the physical characteristics of a sufficient number of the custodial arraignees were sufficiently similar to those of the defendant so as to satisfy principles of due process. The state's primary contention, rather, is that the physical attributes of the custodial arraignees are relatively unimportant in view of the fact that, according to Rivera, he identified the defendant as the assailant immediately upon observing him.
Although, as we noted previously, perfection in the selection of identification fillers is not required, the physical differences between the suspect and the custodial arraignees in the present case were clearly significant enough "to emphasize or highlight the individual whom the police believe[d] [was] the suspect." State v. Marquez , supra, 291 Conn. at 143, 967 A.2d 56 ; see also G. Wells & D. Quinlivan, "Suggestive Eyewitness Identification Procedures and the Supreme Court's Reliability Test in Light of Eyewitness Science: 30 Years Later," 33 Law & Hum. Behav. 1, 7 (2009) ("[r]esearch consistently supports the view that using fillers who do not fit the eyewitness' previous verbal description of the culprit dramatically increases the chances that an innocent suspect who fits this description will be mistakenly identified"). Indeed, the array was overly suggestive by any measure. Cf. State v. Payne , supra, 219 Conn. at 107-108, 591 A.2d 1246 (approving arraignment identification procedure involving eight arraignees of sufficient similarity to defendant); State v. Hinton , supra, 196 Conn. at 292, 493 A.2d 837 (approving arraignment identification procedure involving seven arraignees of sufficient similarity to defendant). Moreover, the fact that Rivera identified the defendant immediately upon seeing him at the arraignment is essentially irrelevant for purposes of this prong of the test, which implicates only the physical characteristics of the suspect and those of the other African-American male custodial **108 arraignees. Because none of those custodial arraignees was sufficiently similar *130 to the defendant in height, weight and age, the identification procedure was impermissibly suggestive. We therefore must decide whether the trial court's denial of the defendant's motion to preclude Rivera's identification testimony as violative of federal due process principles may nevertheless be sustained on the ground that Rivera's identification of the defendant at the arraignment proceeding was reliable under the totality of the circumstances. See, e.g., Manson v. Brathwaite , supra, 432 U.S. at 113, 97 S.Ct. 2243. For the reasons set forth hereinafter, we conclude that it was.
C
An identification that is the product of an unnecessarily suggestive identification procedure will nevertheless be admissible, despite the suggestiveness of the procedure, if the identification is reliable in light of all the relevant circumstances. See, e.g., State v. Marquez , supra, 291 Conn. at 141, 967 A.2d 56. As mandated in Neil v. Biggers , supra, 409 U.S. 188, 93 S.Ct. 375, and reiterated by the court in Manson v. Brathwaite , supra, 432 U.S. 98, 97 S.Ct. 2243, for federal constitutional purposes, we determine whether an identification resulting from an unnecessarily suggestive procedure is reliable under the totality of the circumstances by comparing the "corrupting effect of the suggestive identification" against factors including "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the [identification], and the time between the crime and the [identification]." Manson v. Braithwaite , supra, at 114, 97 S.Ct. 2243, citing Neil v. Biggers , supra, at 199-200, 93 S.Ct. 375. The trial court made express findings regarding each of these so-called Biggers factors, which we now address in turn.
With respect to the first two Biggers factors, the trial court found that Rivera had "ample time"-approximately **109 ten minutes-to observe the assailant from a "very close" distance-no more than a few feet-in a well lit area. The trial court further found that Rivera was clearheaded and attentive during his encounter with the assailant, who had nothing covering his face or head and otherwise made no effort to disguise himself. These findings strongly support the trial court's conclusion concerning the reliability of Rivera's identification of the defendant as the perpetrator notwithstanding the state's use of a flawed identification procedure.
The defendant, however, challenges the trial court's findings as clearly erroneous. In particular, he maintains that "[t]he lighting conditions were poor; it was 3 a.m., and the closest streetlight was on the opposite side of the street." He also claims that Rivera and the other assailant were on opposite sides of the vehicle, the interior of the vehicle also was dark, and Scott pointed a gun at Rivera throughout the encounter. Having carefully reviewed the record, we disagree with the defendant that the trial court's findings concerning Rivera's opportunity to observe the defendant are unsupported by the evidence. Despite the hour and the location of the street lights, the trial court reasonably concluded that there was sufficient light in the area such that Rivera had a good view of the suspect for a considerable period of time. Indeed, the fact that King, the responding officer, chose not to use a flashlight because the scene was so well lit belies the defendant's argument that the lighting conditions were insufficient to afford Rivera an adequate opportunity to observe the defendant. Nor was Rivera's ability to view the defendant diminished by *131 the distance between the two men. As the trial court found, Rivera and the defendant were on opposite sides of the vehicle, only a few feet apart. See G. Wells & D. Quinlivan, supra, 33 Law & Hum. Behav. 9-10 (explaining that facial perception does not begin to diminish until distance of approximately twenty-five **110 feet). In addition, the trial court reasonably credited testimony adduced by the state establishing that the interior dome light of the car shone on the defendant's face while he was searching inside the car.
The record also fully supports the trial court's finding that Rivera was both alert and attentive during the encounter. Rivera testified that he was not under the influence of drugs or alcohol at the time of the offense, and he further explained that he consciously tried to record a memory of both assailants' appearances so that he could later retaliate against them for the robbery.[13] We previously have recognized that a finding of reliability may be bolstered by the witness' conscious effort to focus on the face of his assailant. See State v. Ledbetter , supra, 275 Conn. at 553-54, 881 A.2d 290. The trial court was entitled to credit Rivera's testimony in this regard.
In attempting to call into question the propriety of the trial court's finding regarding Rivera's level of attentiveness, the defendant relies on Dysart's testimony concerning the "weapon focus" effect, a phenomenon whereby "the reliability of an identification can be diminished by a witness' focus on a weapon ...." State v. Guilbert , 306 Conn. 218, 237, 49 A.3d 705 (2012) ; see also N. Steblay, "A Meta-Analytic Review of the Weapon Focus Effect," 16 Law & Hum. Behav. 413, 414 (1992) ("Weapon focus refers to the visual attention that eyewitnesses give to a perpetrator's weapon during the course of a crime. It is expected that the weapon will draw central attention, thus decreasing the ability of the eyewitness to adequately encode and later recall peripheral details." [Emphasis omitted.] ). On cross-examination, however, Dysart acknowledged that the weapon focus effect may diminish the longer a witness **111 is confronted with a weapon because, in such circumstances, the witness also has a longer and therefore better opportunity to perceive details other than the weapon. As we have explained, the trial court found that Rivera observed the defendant for ten minutes. Thus, even if the trial court fully credited Dysart's testimony about the weapon focus effect, the court reasonably could have concluded that, under the circumstances, that phenomenon did not operate to appreciably impair Rivera's ability to focus his attention on the perpetrators themselves.
With respect to the third Biggers consideration, the accuracy of the eyewitness' description of the offender, we agree with the state that Rivera's description of the assailant was both specific and accurate, and included the individual's race (African-American), gender (male), body type (thin), approximate height (six feet, one inch, to six feet, two inches), approximate age (twenty-six to twenty-seven), hair style (short, cropped), and facial hair style (light). This detailed description conforms with considerable accuracy to the information in the record concerning the defendant's physical appearance.
The fourth relevant consideration under Biggers, the level of certainty that Rivera displayed with respect to his identification of the defendant, also strongly favors the state's contention that Rivera's identification *132 was reliable for purposes of the analysis required under the federal constitution. Rivera demonstrated not just high confidence in his identification, but "100 percent" certainty immediately after identifying the defendant and before receiving any feedback from Lawlor.[14] In addition, the defendant's expert, Dysart, testified that concern about a witness' potentially inflated confidence in **112 an identification may be reduced when the witness' confidence level is recorded before any confirmatory comments by officials conducting the identification procedure, as in the present case.
Contrary to the defendant's claim, we agree with the trial court that the final Biggers factor, namely, the length of time between the crime and the identification, provides no persuasive reason for questioning the reliability of Rivera's identification of the defendant. Two weeks passed from the date of the offense until Rivera was given the opportunity to identify the defendant as a perpetrator at the defendant's arraignment on unrelated charges. In a previous case, we held that the reliability of an identification was not compromised when made in connection with an unduly suggestive arraignment procedure conducted less than one month after the crime; State v. Payne , supra, 219 Conn. at 109, 591 A.2d 1246 ; and we have reached the same conclusion despite a delay of two and one-half months between the crime and an identification following the eyewitness' viewing of an unnecessarily suggestive photographic array. See State v. Howard , 221 Conn. 447, 455, 604 A.2d 1294 (1992) ; see also State v. Parker, 197 Conn. 595, 600, 500 A.2d 551 (1985) (dictum indicating that identification made ten months after commission of crime would not necessarily render identification unreliable); State v. Fenn , 16 Conn. App. 318, 323, 547 A.2d 576 ("[a]s for the time factor, since only two weeks had elapsed between the attack on the victim and her identification of the defendant, the assault was still fresh in her mind"), cert. denied, 209 Conn. 822, 551 A.2d 757 (1988), cert. denied, 488 U.S. 1031, 109 S.Ct. 841, 102 L.Ed. 2d 973 (1989). In light of this prior precedent and the findings by the trial court in present case, there is no merit to the defendant's contention that the two week period between the date of the crime and Rivera's identification **113 of the defendant undermined the reliability of that identification.
For these reasons, we will not disturb the trial court's conclusion that, even if Rivera's identification of the defendant was the product of an unnecessarily suggestive procedure, as we have determined it was, the identification nevertheless was reliable, for purposes of the federal constitution, under the totality of the circumstances. Consequently, the defendant cannot prevail on his federal due process claim that the trial court improperly denied his motion to preclude testimony concerning that identification.
D
Having concluded that the trial court properly found that Rivera's pretrial identification of the defendant was sufficiently reliable to pass muster under the federal constitution, it follows that the trial court also was correct in denying the defendant's motion to suppress Rivera's subsequent in-court identification. "[W]hen the defendant contends that an in-court identification followed an unduly suggestive pretrial identification procedure that was conducted by a state actor ... both the initial identification and the in-court identification may be *133 excluded if the improper procedure created a substantial likelihood of misidentification." State v. Dickson , supra, 322 Conn. at 420, 141 A.3d 810. In concluding that Rivera's identification of the defendant was reliable, however, we necessarily have rejected the defendant's contention that the procedure that produced it created a substantial likelihood of misidentification, such that it would be fundamentally unfair for the state to use it against the defendant. See Manson v. Brathwaite , supra, 432 U.S. at 114, 97 S.Ct. 2243 ("reliability is the linchpin in determining the admissibility of identification testimony"); see also State v. Marquez , supra, 291 Conn. at 144, 967 A.2d 56 ("[t]he phrase 'very substantial risk of irreparable **114 misidentification' must be understood as the overall standard for suppressing an out-of-court identification"). It follows, therefore, that, because Rivera's out-of-court identification of the defendant was reliable, and therefore admissible, that identification, although the product of an unnecessarily suggestive identification procedure, cannot be deemed to have so tainted the reliability of Rivera's in-court identification as to preclude the state from using it. See, e.g., State v. Dickson , supra, at 430-31, 141 A.3d 810 (explaining that in-court identification of defendant is admissible when prior out-of-court identification of defendant also is admissible). For that reason, we also reject the defendant's challenge to the trial court's denial of his motion to suppress Rivera's in-court identification of him.
II
We next address the defendant's contention that he was entitled to suppression of Rivera's out-of-court and in-court identifications under the due process provision of article first, § 8, of the Connecticut constitution.[15] In support of his claim, he contends that that provision affords greater protection than the federal due process clause with respect to the admissibility of an eyewitness identification following an unnecessarily suggestive identification procedure.[16] The defendant urges us to **115 reject the federal constitutional framework set forth in Neil v. Biggers , supra, 409 U.S. at 199-200, 93 S.Ct. 375. According to the defendant, it is now apparent that the five factors that comprise the Biggers test are not fully adequate and that, for state constitutional purposes, we should adopt either the reliability standard that the Supreme Court of Utah applies for purposes of that state's constitution; see State v. Ramirez , 817 P.2d 774, 781 (Utah 1991) ; or the framework advocated by the amici curiae, the Connecticut Innocence Project and the Innocence Project, *134 which incorporates aspects of the standards applied by courts in Alaska, New Jersey and Oregon. See Young v. State, 374 P.3d 395, 427 (Alaska 2016) ; State v. Henderson , 208 N.J. 208, 288-89, 27 A.3d 872 (2011) ; State v. Lawson , 352 Or. 724, 761-63, 291 P.3d 673 (2012).[17] We conclude, as a matter of state constitutional law, that it is appropriate to modify the Biggers framework to conform to recent developments in social science and the law. See part II A of this opinion. Accordingly, as we explain in part II B of this opinion, we endorse the factors for determining the reliability of an identification that we identified as a matter of state evidentiary law in State v. Guilbert , supra, 306 Conn. at 253, 49 A.3d 705 ; and we adopt the burden shifting framework embraced by the New Jersey Supreme Court in Henderson for purposes of allocating the burden of proof with respect to the admissibility of an identification that was the product of an unnecessarily suggestive procedure.[18] **116 A
For purposes of ascertaining the contours of the protections afforded under our state constitution, we employ a multifactor approach that we first adopted in State v. Geisler , 222 Conn. 672, 684-85, 610 A.2d 1225 (1992). We consider six nonexclusive factors to the extent relevant, including (1) the text of the operative constitutional provisions, (2) historical insights into the intent of the constitutional framers, (3) related Connecticut precedent, (4) persuasive relevant federal precedent, (5) persuasive precedent of sister state courts, and (6) contemporary understandings of applicable economic and sociological norms, including relevant public policies. See id. Frequently, as in the present case, we analyze these factors to determine whether, in any given case, the state constitution provides greater protection to this state's citizens than the federal constitutional minimum.[19] See, e.g., State v. Ledbetter , supra, 275 Conn. at 560, 881 A.2d 290 ; see also State v. Santiago , 318 Conn. 1, 46 n.38, 122 A.3d 1 (2015) (explaining that Geisler test is "a scheme by which we organize and review, for purposes of state constitutional challenges, the various types of considerations that may bear on any question of first impression").
We note, preliminarily, that this is not the first time that we have had occasion to consider whether the state constitution provides greater protection than the federal constitution in this realm. A dozen years ago, in State v. Ledbetter , supra, 275 Conn. at 560-69, 881 A.2d 290, we **117 applied the Geisler factors and rejected the claim that *135 our state constitution requires that we abandon the Biggers factors as the appropriate factors to consider in determining whether the product of an unnecessarily suggestive identification procedure is nevertheless reliable and, therefore, admissible. In reaching this conclusion, we reasoned that three of the Geisler factors, namely, the text of the relevant constitutional provisions, holdings of this state's appellate courts, and federal precedent, favored the state; id., at 561-63, 881 A.2d 290 ; that two such factors, the historical approach and the sibling state approach, were neutral; id., at 563, 881 A.2d 290 ; and that the sixth factor, contemporary economic and sociological considerations, favored the defendant; id., at 566, 881 A.2d 290 ; largely because credible scientific studies had indicated that the fourth Biggers factor, the level of certainty demonstrated by the eyewitness at the identification, generally is not a particularly reliable indicator of accuracy. See id.
In the present case, the defendant does not challenge our conclusion in Ledbetter that the virtually identical language of the state and federal constitutional due process provisions favors the state because that common language supports a determination that the provisions stem from a common source and, as a consequence, share a common meaning. See id., at 562 and n.18, 881 A.2d 290. The defendant also acknowledges that, as we concluded in Ledbetter , the historical approach is a neutral factor that favors neither party. See id., at 563, 881 A.2d 290. The defendant claims, however, that, in light of continuing scientific and legal developments, related Connecticut precedent, persuasive federal and sister state precedent, and relevant economic and sociological considerations now militate in favor of modifying the Biggers test for purposes of the state constitution.
We address each of these factors in turn in order to determine whether the Biggers framework provides **118 adequate protection for purposes of our state constitution. We do so cognizant of the fact that, as we "previously [have] recognized ... mistaken eyewitness identifications are a significant cause of erroneous convictions; State v. Guilbert , supra, 306 Conn. at 249-50, 49 A.3d 705 ('mistaken eyewitness identification testimony is by far the leading cause of wrongful convictions'); and the risk of mistake is particularly acute when the identification has been tainted by an unduly suggestive procedure. United States v. Wade , 388 U.S. 218, 229, 87 S.Ct. 1926, 18 L.Ed. 2d 1149 (1967) ('[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor-perhaps it is responsible for more such errors than all other factors combined' ...)." (Footnote omitted.) State v. Dickson , supra, 322 Conn. at 425-26, 141 A.3d 810.
We turn first to relevant Connecticut precedent. As we have explained, this court previously held in Ledbetter that the state constitution does not provide greater protection than the federal constitution in this context. See State v. Ledbetter , supra, 275 Conn. at 569, 881 A.2d 290. Since our decision in Ledbetter , however, this court has held that, as an evidentiary matter, and even in cases in which an identification was not preceded by an unnecessarily suggestive procedure, a defendant is entitled to present expert testimony on the reliability of eyewitness testimony. We further held that such testimony "satisfies the threshold admissibility requirement ... that [it] ... be based on scientific knowledge rooted in the methods and procedures of science ... at least with respect to the following propositions: (1) there is at best a weak correlation between a witness' confidence in his or her identification and *136 the identification's accuracy; (2) the reliability of an identification can be diminished by a witness' focus on a weapon; (3) high stress at the time of observation may render a witness less **119 able to retain an accurate perception and memory of the observed events; (4) cross-racial identifications are considerably less accurate than identifications involving the same race; (5) memory diminishes most rapidly in the hours immediately following an event and less dramatically in the days and weeks thereafter; (6) an identification may be less reliable in the absence of a double-blind, sequential identification procedure; (7) witnesses may develop unwarranted confidence in their identifications if they are privy to postevent or postidentification information about the event or the identification; and (8) the accuracy of an eyewitness identification may be undermined by unconscious transference, which occurs when a person seen in one context is confused with a person seen in another." (Citations omitted; internal quotation marks omitted.) State v. Guilbert , supra, 306 Conn. at 253-54, 49 A.3d 705 ; see also id., at 237, 49 A.3d 705 ("[t]he science abundantly demonstrates the many vagaries of memory encoding, storage and retrieval; the malleability of memory; the contaminating effects of extrinsic information; the influence of police interview techniques and identification procedures; and the many other factors that bear on the reliability of eyewitness identifications" [internal quotation marks omitted] ).
In reaching this conclusion in Guilbert , we explained that this court's determination in Ledbetter that the state constitution did not provide greater protection than the federal constitution "was premised in part on our reservations about scientific studies that we now find persuasive." Id., at 252, 49 A.3d 705. We also acknowledged "the tension between our reasoning and analysis in [ Guilbert ] and the reasoning and analysis of Biggers ...." Id. We concluded, however that there was no need to resolve that tension "because Biggers ... involved alleged due process violations predicated on the state's use of unnecessarily suggestive identification procedures, whereas [ Guilbert ] involv[ed] the admissibility **120 of expert testimony on the fallibility of eyewitness identification testimony." Id., 252-53 n.33, 49 A.3d 705.
With the need to resolve the tension between Guilbert and Biggers now being squarely before us, we conclude that Guilbert provides the preferable framework for state constitutional as well as evidentiary claims involving the reliability of eyewitness identifications. First, although we do not necessarily agree with the defendant that our conclusion in Guilbert that, as an evidentiary matter, defendants are entitled to present expert testimony that "there is at best a weak correlation between a witness' confidence in his or her identification and the identification's accuracy"; id., at 253, 49 A.3d 705 ; necessarily conflicts directly with the Biggers directive that courts consider the eyewitness' level of confidence, we believe that the Guilbert approach provides courts with greater flexibility and specificity. Second, we identified in Guilbert several factors that may affect the reliability of an eyewitness identification that were not expressly recognized by the court in Biggers , including the witness' focus on a weapon, the level of stress at the time of observation, the problems of cross-racial identification, postevent exposure to information about the subject of the identification, and the potential for unconscious transference.[20]
*137 Id., at 253-54, 49 A.3d 705. For the same reasons that we concluded in Guilbert that focusing the trial court's attention on these specific factors instead of on the more general Biggers factors would enhance the accuracy of the evidentiary inquiry into the reliability of an eyewitness identification, we conclude that using the Guilbert framework would enhance the accuracy of the constitutional inquiry into the reliability of an identification **121 that has been tainted by improper state conduct. Third, the Guilbert approach allows the reliability analysis to evolve as the relevant science evolves. See id., at 258, 49 A.3d 705 ("[These] variables are not exclusive. Nor are they intended to be frozen in time." [Internal quotation marks omitted.] ). Accordingly, we agree with the defendant that Guilbert supports the proposition that, under our state constitution, the Biggers analysis is inadequate to prevent the admission of unreliable identifications that are tainted by an unduly suggestive procedure.[21]
With respect to the next Geisler factor, persuasive federal precedent,[22] the defendant contends that, although federal courts continue to be bound by the Biggers test, there are signs that a change may be in the offing. In support of this claim, he relies on Justice Sotomayor's dissenting opinion in Perry v. New Hampshire , 565 U.S. 228, 132 S.Ct. 716, 181 L.Ed. 2d 694 (2012), in which she took note of recent scientific studies demonstrating that, contrary to the assumption of Biggers that the accuracy of an identification correlates directly with the confidence of the eyewitness, in fact, confidence frequently "is a poor gauge of accuracy **122 ...." Id., at 264, 132 S.Ct. 716 (Sotomayor, J., dissenting); see also id., at 264 n.10, 132 S.Ct. 716 (citing studies). The defendant also contends that several other federal courts have expressed reservations about the assumption underlying the relationship between confidence and accuracy. See, e.g., Phillips v. Allen , 668 F.3d 912, 916 (7th Cir. 2012) (observing that amicus curiae in Perry had cited studies that had "called th[e] notion [that confidence is correlated with accuracy] into very serious question" [internal quotation marks omitted] ); Grayer v. McKee , 149 Fed. Appx. 435, 447-48 (6th Cir. 2005) (Gwin, J., concurring in the judgment) (observing that "[m]any [social science] studies demonstrate that there is no correlation between the confidence of the witness and the accuracy of the identification" [internal quotation marks omitted *138 ] ), cert. denied, 547 U.S. 1059, 126 S.Ct. 1661, 164 L.Ed. 2d 403 (2006) ; Cossel v. Miller , 229 F.3d 649, 655 n.4 (7th Cir. 2000) (level of certainty at time of identification has little connection to accuracy when identification is preceded by unduly suggestive identification procedure); Abdur-Raheem v. Kelly , 98 F.Supp.2d 295, 306 (E.D.N.Y. 2000) ("[t]he value of at least two of the [ Biggers ] factors-accuracy of the witness' prior description and certainty at the confrontation-has been seriously questioned"), rev'd on other grounds, 257 F.3d 122 (2d Cir. 2001), cert. denied sub nom. Donnelly v. Abdur Raheem , 534 U.S. 1118, 122 S.Ct. 930, 151 L.Ed. 2d 892 (2002).[23] Although we recognize that Biggers continues to provide the controlling framework for all federal courts, we agree with the defendant that these cases provide support for his contention that there is growing recognition that that test is flawed in **123 some respects. Specifically, the cases support the notion that the Biggers assumption that confidence at the time of identification is correlated with accuracy is not always valid.
We next consider persuasive precedents of other state courts. As the defendant notes, several state courts have rejected the Biggers analysis under their respective state constitutions in favor of a more expansive standard. For example, in 2011, the Supreme Court of New Jersey concluded that, in light of recent scientific developments that "abundantly [demonstrate] the many vagaries of memory encoding, storage, and retrieval; the malleability of memory; the contaminating effects of extrinsic information, the influence of police interview techniques and identification procedures; and the many other factors that bear on the reliability of eyewitness identifications"; (internal quotation marks omitted) State v. Henderson , supra, 208 N.J. at 283, 27 A.3d 872 ; the Biggers test provided inadequate protection against the risk of misidentification. See id., at 285-86, 27 A.3d 872. Before reaching its conclusion, the New Jersey Supreme Court appointed a special master who, following extensive hearings conducted for the purpose of evaluating scientific and other evidence about eyewitness identifications, issued a comprehensive report containing numerous findings and recommendations. See id., at 217-18, 27 A.3d 872. On the basis of those findings and recommendations, the court in Henderson concluded that the New Jersey constitution required a new framework "that allows judges to consider all relevant factors that affect reliability in deciding whether an identification is admissible; that is not heavily weighted by factors that can be corrupted by suggestiveness; that promotes deterrence in a meaningful way; and that focuses on helping jurors both [to] understand and evaluate the effects that various factors have on memory ...." Id., at 288, 27 A.3d 872. With these criteria in mind, the court adopted the following framework: First, **124 to obtain a pretrial hearing, the defendant has the initial burden of showing that some system variable[24] undermined the reliability of the eyewitness identification. See id., 288-89, 27 A.3d 872. Second, if the defendant meets this burden, the state must then offer proof to *139 show that the identification is reliable in light of all relevant system and estimator variables.[25] Id., at 289, 27 A.3d 872. Third, if the state meets its burden, the defendant must then prove a very substantial likelihood of misidentification. Id. If the defendant meets that burden of proof, the identification must be suppressed. See id. ; see also Young v. State , supra, 374 P.3d at 427 (adopting procedure under Alaska constitution for determining admissibility of identification following unnecessarily suggestive procedure that "closely follows the [ Henderson ] framework").
The court in Henderson identified twelve nonexclusive and nonstatic estimator variables that courts should consider in determining the reliability of an identification that resulted from an unnecessarily suggestive procedure.[26] See **125 State v. Henderson , supra, 208 N.J. at 291-92, 27 A.3d 872. The court recognized that, contrary to the apparent assumption of the court in Biggers , "a [witness'] level of confidence, standing alone, may not be an indication of the reliability of the identification." (Internal quotation marks omitted.) Id., at 241, 254, 27 A.3d 872. The court observed, however, that "[t]he [s]pecial [m]aster found that ... highly confident witnesses can make accurate identifications 90 [percent] of the time." (Emphasis in original.) Id., at 254, 27 A.3d 872. The court modified this Biggers factor accordingly. See id., at 292, 27 A.3d 872 (court should consider whether witness "express[ed] high confidence at the time of the identification before receiving any feedback or other information").
Similarly, in State v. Ramirez , supra, 817 P.2d at 774, the Supreme Court of Utah rejected the Biggers framework as being "scientifically unsupported" and adopted as a matter of state constitutional law a "more empirically based approach" designed to "allow a court to consider fully 'the totality of the circumstances' surrounding the identification ...." Id., at 780. The court in Ramirez noted that, although the factors that courts should consider "are generally comparable to the Biggers factors, they more precisely define the focus of the relevant inquiry."[27]
*140 Id., at 781. Like the court in Henderson , the court in Ramirez rejected the court's assumption in Biggers that the certainty demonstrated by the eyewitness is invariably an indicator of the accuracy **126 of the identification. See id. ; see also State v. Hunt , 275 Kan. 811, 818, 69 P.3d 571 (2003) (adopting Ramirez framework).[28]
Other state courts have concluded that any identification that is the result of an unnecessarily suggestive identification procedure is inadmissible per se under their respective state constitutions. See Commonwealth v. Johnson , 420 Mass. 458, 472, 650 N.E.2d 1257 (1995) ("[o]nly a rule of per se exclusion [of identifications resulting from unnecessarily suggestive procedures] can ensure the continued protection against the danger of mistaken identification and wrongful convictions"); id., at 462-63, 650 N.E.2d 1257 ( Biggers framework is not consistent with due process requirements of Massachusetts constitution); People v. Adams , 53 N.Y.2d 241, 250, 423 N.E.2d 379, 440 N.Y.S.2d 902 (1981) (adopting "rule excluding improper showups and evidence derived therefrom," which was required by New York constitution); State v. Dubose , 285 Wis. 2d 143, 165-66, 168, 699 N.W.2d 582 (2005) ("evidence obtained from an out-of-court **127 showup is inherently suggestive and will not be admissible unless, based on the totality of the circumstances, the procedure was necessary," and admission of identification that resulted from unnecessarily suggestive showup violated Wisconsin constitution). In support of this conclusion, the Massachusetts and Wisconsin courts relied on scientific studies performed since Biggers that cast doubt on the reliability of eyewitness testimony. See Commonwealth v. Johnson , supra, at 467, 650 N.E.2d 1257 ("studies conducted by psychologists and legal researchers ... have confirmed that eyewitness testimony is often hopelessly unreliable"); State v. Dubose , supra, at 162, 699 N.W.2d 582 ("[recent] studies confirm that eyewitness testimony is often hopelessly unreliable" [internal quotation marks omitted] ).
In State v. Ledbetter , supra, 275 Conn. at 534, 881 A.2d 290, this court concluded that Johnson , Adams and Dubose did not support the defendant's position because those cases "did not reach the issue of *141 reliability." Id., at 565, 881 A.2d 290 ; see also id. ("like Massachusetts and New York, Wisconsin has not considered whether the Biggers factors [were in contravention of] its state constitution"). It is now clear to us, however, that these cases necessarily were premised on a determination that the Biggers reliability test provides inadequate protection against the risk of misidentification. See Commonwealth v. Johnson , supra, 420 Mass. at 469, 650 N.E.2d 1257 ("the admission of unnecessarily suggestive identification procedures under the [ Biggers ] reliability test would likely result in the innocent being jailed while the guilty remain free"); State v. Dubose , supra, 285 Wis. 2d at 164, 699 N.W.2d 582 ("it is extremely difficult, if not impossible, for courts [using the Biggers analysis] to distinguish between identifications that were reliable and identifications that were unreliable"). Thus, although those courts did not expressly consider the possibility of adopting a reliability test that was more detailed and expansive than Biggers -the course that we are considering **128 in the present case-the cases clearly support the proposition that the Biggers reliability test is inadequate, which is the necessary first step of our analysis. Accordingly, we now conclude that these cases support the defendant's position.
Finally, we note that the Supreme Court of Oregon has held as a matter of state evidentiary law that, when a defendant has filed a motion to exclude eyewitness identification evidence, the state must establish that the evidence is admissible under the ordinary rules of evidence. State v. Lawson , supra, 352 Or. at 761, 291 P.3d 673. If the state meets that burden, the burden shifts to the defendant to establish that, "although the eyewitness evidence is otherwise admissible, the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence." Id., at 762, 291 P.3d 673. In determining the probative value of eyewitness evidence, "trial courts must examine the relative reliability of [the] evidence produced by the parties .... The more factors-the presence of system variables alone or in combination with estimator variables[29] -that weigh against reliability of the identification, the less persuasive the identification evidence will be to prove the fact of identification, and correspondingly, the less **129 probative value that identification will have." Id., at 757, 291 P.3d 673. The court in Lawson emphasized that an unnecessarily suggestive procedure was not a prerequisite for the exclusion of the identification under this test.[30] See *142 id., at 746-47, 291 P.3d 673. The court also rejected the assumption in Biggers that confidence correlates to accuracy. Id., at 745, 291 P.3d 673 ("[u]nder most circumstances, witness confidence or certainty is not a good indicator of identification accuracy"); see also Brodes v. State , 279 Ga. 435, 442, 614 S.E.2d 766 (2005) (holding that, as matter of state evidentiary law, courts should no longer instruct juries that level of certainty is correlated to accuracy).
Thus, courts in Alaska, Kansas, Massachusetts, New Jersey, New York, Utah and Wisconsin have held as a matter of state constitutional law that the Biggers framework insufficiently protects against the risk of misidentification, and the courts of Georgia and Oregon have reached the same conclusion as a matter of state evidentiary law. Only two courts that have considered this issue have held that Biggers is consistent with their state constitutions. See State v. Buti , 131 Idaho 793, 799, 964 P.2d 660 (1998) (reliability factors under Idaho constitution are identical to Biggers factors); State v. Leclair , 118 N.H. 214, 218-20, 385 A.2d 831 (1978) (noting that Biggers test "is based on federal constitutional minima and does not preclude the states from adopting a per se rule under [s]tate law," and then applying Biggers test). In contrast to the courts that have rejected Biggers , however, the Idaho and New Hampshire courts did not engage in any analysis of recent scientific developments **130 that have exposed the deficiencies of the Biggers reliability test. Upon close review of the various factors identified in the foregoing precedent, we are persuaded by the state cases that, as a matter of state constitutional and evidentiary law, have rejected the Biggers analysis as insufficient to protect against the risk that unreliable eyewitness identifications will be presented to the jury.
We next address the final Geisler factor, namely, contemporary understandings of applicable economic and sociological norms. As we have indicated, this court previously has concluded that this factor weighs in favor of the defendant's position. State v. Ledbetter , supra, 275 Conn. at 566, 881 A.2d 290 (contemporary economic and sociological considerations favor defendant's position because recent scientific research has exposed flaws in Biggers framework, particularly with respect to assumption that confidence is correlated with accuracy); see also State v. Guilbert , supra, 306 Conn. at 237, 49 A.3d 705 (recent scientific developments "abundantly [demonstrate] the many vagaries of memory encoding storage and retrieval; the malleability of memory, the contaminating effects of extrinsic information; the influence of police interview techniques and identification procedures; and the many other factors that bear on the reliability of eyewitness identifications" [internal quotation marks omitted] ). We continue to believe that this factor supports the defendant's claim that the Biggers framework provides inadequate protection under our state constitution.
In summary, we conclude that this state's precedent, persuasive federal and sister state precedent, and contemporary understandings of economic and sociological norms favor the defendant's claim concerning the inadequacy of the Biggers factors for purposes of the state constitution. The relevant state constitutional text favors retention of the Biggers factors. And the final **131 consideration, namely, historical *143 insights into the intent of the framers, is neutral. Upon careful consideration of these various factors and their relative import to the issue presented, we agree with the defendant that the Biggers framework is insufficiently protective of the defendant's due process rights under the state constitution. We therefore overrule our conclusion to the contrary in Ledbetter .
B
In light of the foregoing conclusion, we next must determine the proper framework, for state constitutional purposes, for evaluating the reliability of an identification that is the result of an unnecessarily suggestive identification procedure. Having reviewed the various approaches used by courts around the country, we conclude that the most appropriate framework is that adopted by the New Jersey Supreme Court in State v. Henderson , supra, 208 N.J. at 288-89, 27 A.3d 872. Pursuant to that framework, to obtain a pretrial hearing, the defendant has the initial burden of offering some evidence that a system variable undermined the reliability of the eyewitness identification. See id., at 288-89, 27 A.3d 872. If the defendant meets this burden, the state must then offer evidence demonstrating that the identification was reliable in light of all relevant system and estimator variables. Id., at 289, 27 A.3d 872. If the state adduces such evidence, the defendant must then prove a very substantial likelihood of misidentification. See id. If the defendant meets that burden of proof, the identification must be suppressed. See id. ; cf. State v. Ortiz , supra, 252 Conn. at 553, 747 A.2d 487 (under Biggers framework, "[t]he defendant bears the burden of proving both that the identification procedures were unnecessarily suggestive and that the resulting identification was unreliable" [internal quotation marks omitted] ).
It bears emphasis that this framework does not differ significantly from our current approach because, under **132 the latter, if the defendant has presented evidence that the identification procedure was unnecessarily suggestive and the state has presented no evidence that the identification was nevertheless reliable, a court could not reasonably conclude that the identification should be admissible. Nevertheless, we recognize that the requirement that the defendant provide "some evidence" of suggestiveness may necessitate somewhat less evidence to trigger the admissibility inquiry than is required under the Biggers framework. State v. Henderson , supra, 208 N.J. at 288, 27 A.3d 872 ; see id., at 293, 27 A.3d 872 ("estimator variables [will] no longer be ignored in the court's analysis until it [finds] that an identification procedure was impermissibly suggestive"). We agree with the court in Henderson that this lower threshold is appropriate both because it "will provide more meaningful deterrence" and because "more extensive hearings will address reliability with greater care and better reflect how memory works." Id.
In the absence of evidence of a suggestive procedure or other extraordinary circumstances, however, we continue to believe that evidence relating solely to estimator factors that affect the reliability of the identification goes to the weight, not the admissibility, of the identification. See Perry v. New Hampshire , supra, 565 U.S. at 237, 132 S.Ct. 716 ("[t]he [c]onstitution ... protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy"); see also id. ("juries are assigned the task of *144 determining the reliability of the evidence presented at trial" unless "[the] evidence is so extremely unfair that its admission violates fundamental conceptions of justice" [internal quotation marks omitted] ); State v. Guilbert , supra, 306 Conn. at 251 n.31, 49 A.3d 705 (this court's "approach to eyewitness identification testimony [that **133 is not tainted by improper procedure] is exactly the sort of approach that Perry encourages"); State v. Ledbetter , supra, 185 Conn. at 612, 441 A.2d 595 ("challenges [relating to the reliability of identifications that are not tainted by improper procedure] go to the weight rather than to the admissibility of the evidence"). Accordingly, like the court in Henderson , we conclude that a pretrial hearing ordinarily is not required when there is no evidence of a suggestive procedure. See State v. Henderson , supra, 208 N.J. at 293-94, 27 A.3d 872. Indeed, even the Supreme Court of Oregon, which concluded that an identification that was not preceded by a suggestive procedure may be inadmissible under that state's ordinary rules of evidence, has recognized that "trial courts will continue to admit most eyewitness identifications. That is so because, although possible, it is doubtful that issues concerning one or more of the estimator variables that [the court has] identified will, without more, be enough to support an inference of unreliability sufficient to justify the exclusion of the eyewitness identification. In that regard, [the court] anticipate[s] that when the facts of a case reveal only issues regarding estimator variables, defendants will not seek a pretrial ruling on the admission of the eyewitness identification." State v. Lawson , supra, 352 Or. at 762, 291 P.3d 673. Thus, that court recognized that evidence relating to estimator variables, standing alone, ordinarily will not render an identification inadmissible.
With respect to the reliability standard that the trial court must apply at a pretrial hearing, we are persuaded that the trial court should consider the eight estimator variables that this court identified in State v. Guilbert , supra, 306 Conn. at 253-54, 49 A.3d 705, which overlap considerably with the estimator variables that the court identified in Henderson .[31] See footnote 26 of this opinion. As we **134 recognized in Guilbert , these variables are neither "exclusive" nor "frozen in time." (Internal quotation marks omitted.) Id., at 258, 49 A.3d 705. Rather, both the defendant and the state may adduce expert testimony regarding recent scientific developments that cast light on particular factors, or that establish the existence of additional relevant factors, provided, of course, that the testimony meets the criteria for admissibility that we discussed in Guilbert . See id., at 257, 49 A.3d 705 (whether to permit expert testimony on reliability of eyewitness testimony is within discretion of trial court after considering qualifications of expert witness and scientific *145 foundation for opinion).[32] The parties may also present such testimony at trial. In addition, it may be appropriate for the trial **135 court to craft jury instructions to assist the jury in its consideration of this issue. See id., at 257-58, 49 A.3d 705 (trial court retains discretion to give "jury instructions on the fallibility of eyewitness identification evidence," provided that "any such instructions should reflect the findings and conclusions of the relevant scientific literature pertaining to the particular variable or variables at issue in the case"); State v. Henderson , supra, 208 N.J. at 296, 27 A.3d 872 ("when identification is at issue in a case, trial courts will continue to provide ... appropriate guidelines to focus the jury's attention on how to analyze and consider the trustworthiness of eyewitness identification" [internal quotation marks omitted] ).
With these principles in mind, we consider the defendant's claim that, if the trial court had applied the proper standard in the present case, it would have concluded that Rivera's identification of him should be excluded as insufficiently reliable. Specifically, the defendant claims that the trial court would have been precluded from considering the defendant's level of confidence. In addition, he contends, the trial court would have been compelled to consider the tendency of eyewitnesses to overestimate the duration and quality of their opportunity to view the perpetrator, Rivera's lack of sleep and the poor lighting at the scene of the crime, the tendency of fear and stress to impair perception and recall, the two week interval between the crime and the observation, Rivera's nonspecific description of the perpetrator's facial features, and the fact that Rivera and the defendant were of different races.
We disagree with the defendant's claim. Dysart testified at the suppression hearing and at trial that the presence of a weapon can divert an eyewitness' attention from the perpetrator's face to the weapon, that eyewitnesses may have difficulty identifying persons of a different race, that high levels of stress adversely affect the accuracy of an identification, and that, **136 because the perpetrators in the present case were rifling through the car for much of the time, Rivera's opportunity to view them would have been relatively short. In addition, Dysart testified at trial that "there is a moderate relationship between accuracy and [confidence]" when the eyewitness immediately expresses high confidence after a nonsuggestive procedure, but that positive *146 feedback can artificially inflate confidence and can lead witnesses to overestimate the quality of their opportunity to observe the perpetrator. Although the specific factors that Dysart addressed are not expressly included in the Biggers framework, that framework does direct the court to consider "the opportunity of the witness to view the criminal at the time of the crime," "the witness' degree of attention," and "the level of certainty demonstrated by the witness at the confrontation ...." Neil v. Biggers , supra, 409 U.S. at 199, 93 S.Ct. 375. These general factors encompass the more specific reliability factors that we have identified in the present case and that were addressed by Dysart. Indeed, as the Supreme Court of Utah has observed with respect to the Ramirez reliability factors, which are similar to the factors that we have adopted; see State v. Ramirez , supra, 817 P.2d at 781 ; footnote 27 of this opinion; the factors that we have adopted "are generally comparable to the Biggers factors" and are merely intended to "more precisely define the focus of the relevant inquiry." State v. Ramirez , supra, at 781 ; see also State v. Hunt , supra, 275 Kan. at 818, 69 P.3d 571 ("[the Ramirez standard] should not be considered as a rejection of the Biggers model but, rather, as a refinement in the analysis"). Moreover, to the extent that the defendant contends that the trial court did not adequately consider the corrupting effect that the suggestiveness of the procedure had on Rivera's memory, nothing in Biggers or its progeny bars the trial court from considering evidence that the witness' memory has been affected by a suggestive procedure. To **137 the contrary, Manson v. Brathwaite , supra, 432 U.S. at 98, 97 S.Ct. 2243, directs that the reliability factors be evaluated in light of "the corrupting effect of the suggestive identification itself." Id., at 114, 97 S.Ct. 2243.
There is no indication in the record that the trial court declined to consider any portion of Dysart's testimony because it believed that the evidence was not relevant under Biggers . Nor is there any evidence that the trial court believed that it was required under Biggers to assume that there is a correlation between confidence and accuracy under all circumstances, despite Dysart's testimony to the contrary. Rather, the trial court's finding that such a correlation existed in the present case was supported by Dysart's testimony that there is a "moderate" correlation between confidence and accuracy when confidence is expressed immediately after the identification and before the eyewitness has received any positive feedback. Although we have concluded that the identification procedure in the present case was suggestive-which, according to Dysart, can weaken the correlation between confidence and accuracy-Dysart did not testify that, if a procedure is suggestive in any manner and to any degree, that suggestiveness automatically and fully negates the correlation. The trial court's conclusion that Rivera's confidence was indicative of accuracy is also supported by the fact that Rivera's description of the defendant was, in fact, accurate. Finally, the defendant has not identified any evidence that he was prevented from presenting at the suppression hearing or at trial on the ground that it was not relevant under Biggers . Accordingly, we conclude that the trial court's application of the Biggers framework instead of the reliability standard that we have adopted in the present case was harmless because it is not reasonably possible that the court would have reached a different conclusion as to the admissibility of Rivera's identification under our **138 new framework. See, e.g., State v. Montgomery , 254 Conn. 694, 718, 759 A.2d 995 (2000) ("[t]he state bears the burden of demonstrating that the constitutional error *147 was harmless beyond a reasonable doubt" [internal quotation marks omitted] ).
The judgment is affirmed.
In this opinion the other justices concurred.

The trial court had previously granted the defendant's motion for acquittal as to the count of carrying a pistol without a permit. The jury found the defendant not guilty of the charge of murder.

The defendant appealed to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-2.

The due process clause of the fourteenth amendment to the United States constitution provides in relevant part: "No State shall ... deprive any person of life, liberty or property, without due process of law ...."

Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall be ... deprived of life, liberty or property without due process of law ...."

The facts set forth hereinafter were either established by the state at trial or found by the trial court.

The trial court's oral ruling, its supplemental memorandum of decision, and testimony by Lawlor and Rivera differ on several details with respect to the arraignment process, for example, the order in which custodial arraignees entered, the number of arraignments observed, and the demographics of the arraignees. By all accounts, however, Rivera immediately identified the defendant as he entered the courtroom, before he actually was arraigned.

Also noteworthy is the rarity of this identification procedure, which apparently has not been the subject of a reported decision in this state in more than twenty years. See State v. King , 35 Conn. App. 781, 785-89, 647 A.2d 25 (1994), aff'd, 235 Conn. 402, 665 A.2d 897 (1995).

As the trial court noted, although these factors were articulated in the context of a photographic array, they are generally applicable to all out-of-court identifications. See, e.g., State v. Packard , 184 Conn. 258, 261-62, 439 A.2d 983 (1981) (applying factors to voice identification).

As we explain more fully hereinafter, our resolution of the first prong of the suggestiveness test makes it unnecessary for us to address the test's second prong.

We note that the term "array" ordinarily refers to a collection of mugshots or other photographs included in a grouping of such photographs, whereas the terms "lineup" and "show up" refer to the subjects of a corporeal identification procedure. Nevertheless, we use the term "array" to refer to the group of arraignees included in the identification procedure used in the present case because that procedure cannot reasonably be characterized either as a "lineup" or as a "show up," as those terms are commonly used in eyewitness identification cases.

The parties stipulated that the first person arraigned was a white male who was not in custody. He was then followed by the fourteen custodial arraignees. In its oral ruling, the trial court noted that Rivera and Lawlor remained in the courtroom for seven arraignments. The trial court's supplemental memorandum of decision states only that the two men did not observe all of the arraignments. The stipulation does not reflect how many arraignments Rivera and Lawlor viewed. Lawlor testified that he and Rivera observed seven arraignments and that the defendant and Scott were the sixth and seventh persons arraigned, respectively. Rivera testified, however, that he and Lawlor did not observe any arraignments because he made his identification of the defendant as soon as he and the other custodial arraignees entered the courtroom.

On appeal, the state seeks to expand the composition of the array well beyond the thirty-four arraignees identified by the trial court, claiming that it should include "lawyers, court personnel, bail bondsmen, and members of the public." In support of this contention, the state relies on certain testimony by Lawlor in which he indicates that he directed Rivera's attention to every person in the courthouse. Lawlor did testify at the suppression hearing and at trial that he told Rivera to "look at everybody walking" in the hallway outside the courtroom, to "look at these people in ... the general population," and to "look at every person that goes by you ...." Lawlor also testified, however, that, after giving these general instructions, he simply left Rivera unattended and returned to his office. In any event, at trial, Rivera testified that Lawlor told him to "let [him] know if [Rivera] notic[ed] anybody that is coming out from those doors," referring to the door through which the custodial arraignees entered the courtroom. Moreover, at the probable cause hearing, Rivera testified that he sat in the courtroom "waiting to see who is going to come out the door." He also testified that "[t]hey [were] just bringing in inmates from the day before that. They [were] bringing them all in. And I can identify two of the guys that [were] coming out those doors." This testimony makes it sufficiently clear that, as far as Rivera was concerned, the group of persons to be considered for purposes of the identification procedure was the group comprised of the custodial arraignees.

More specifically, Rivera testified that he was "trying to ... keep a clear vision on their face[s]" so that he could have "retaliated" against "the right person instead of having the wrong person."

As we previously noted, Rivera testified that Lawlor said that the defendant and Scott "may be the guys" who committed the offenses only after Rivera expressed complete confidence in his identification of them.

It is axiomatic that the federal constitution establishes a minimum national standard for the exercise of individual rights and that states are not prohibited from affording greater protections for such rights; see, e.g., State v. Skok , 318 Conn. 699, 708, 122 A.3d 608 (2015) ; either by way of their state constitutions, statutes or otherwise.

The defendant raised his state constitutional claim in his motion to suppress, but he did not brief that claim separately from his claim under the federal constitution, and, accordingly, the trial court did not analyze the two claims separately. We note, however, that, even if the defendant had briefed the claims separately, the trial court would have been bound by this court's determination in State v. Ledbetter , supra, 275 Conn. at 569, 881 A.2d 290, that the state constitution provides no greater protection than the federal constitution in regard to the admissibility of eyewitness identification testimony. In any event, the record is adequate for our review of the defendant's state constitutional claim and it is of constitutional magnitude. We therefore consider it in accordance with the principles for appellate review of unpreserved constitutional claims articulated by this court in State v. Golding , 213 Conn. 233, 239-40, 567 A.2d 823 (1989), as modified by In re Yasiel R ., 317 Conn. 773, 781, 120 A.3d 1188 (2015).

We discuss these cases more fully in this part of the opinion.

Under Henderson , the defendant bears the burden of adducing evidence indicating that the identification procedure undermined the reliability of the identification; if the defendant makes such a showing, the state must offer evidence to demonstrate that the identification nevertheless was reliable under the totality of the circumstances; if the state adduces such evidence, the defendant assumes the burden of proving a very substantial likelihood of misidentification. See State v. Henderson , supra, 208 N.J. at 288-89, 27 A.3d 872 ; see also part II B of this opinion.

As this court previously has observed, "[t]he Geisler factors serve a dual purpose: they encourage the raising of state constitutional issues in a manner to which the opposing party-the state or the defendant-can respond; and they encourage a principled development of our state constitutional jurisprudence. Although in Geisler we compartmentalized the factors that should be considered in order to stress that a systematic analysis is required, we recognize that they may be inextricably interwoven ... [and] [n]ot every Geisler factor is relevant in all cases." (Internal quotation marks omitted.) State v. Jenkins , 298 Conn. 209, 262, 3 A.3d 806 (2010).

As we discuss more fully hereinafter, however, the Guilbert factors are subsumed to some extent by the Biggers directive that the court consider "the opportunity of the witness to view the criminal at the time of the crime ... [and] the witness' degree of attention ...." Neil v. Biggers , supra, 409 U.S. at 199, 93 S.Ct. 375.

It bears emphasis that, in Biggers , the court explained that the factors to be considered under the federal constitution for determining the reliability of an unnecessarily suggestive identification procedure derived from that court's prior cases. See Neil v. Biggers , supra, 409 U.S. at 199, 93 S.Ct. 375. Just as the factors garnered from those prior cases guided the court in Biggers for purposes of its federal constitutional analysis, our prior case law, in particular, State v. Guilbert , supra, 306 Conn. 218, 49 A.3d 705, guides us in determining the proper approach under the state constitution.

We note that "a proper Geisler analysis does not require [that we] simply ... tally and follow the decisions favoring one party's state constitutional claim; a deeper review of those decisions' underpinnings is required because we follow only 'persuasive' decisions. See Kerrigan v. Commissioner of Public Health , 289 Conn. 135, 140-41, 957 A.2d 407 (2008) ('the state court cases that have determined that gay persons do not constitute a quasi-suspect class, like [certain] federal cases ... employed a flawed analysis, and, therefore, they do not constitute persuasive authority')." State v. Jenkins , 298 Conn. 209, 262, 3 A.3d 806 (2010).

We note that, with the exception of Phillips v. Allen , supra, 668 F.3d at 912, all of these cases predate this court's decision in Ledbetter . Unlike the defendant in the present case, however, the defendant in Ledbetter did not focus his argument that the Biggers factors constitute an insufficiently protective standard under the state constitution with respect to any particular Biggers factor.

"System variables are factors, such as lineup procedures, that are within the control of the criminal justice system." State v. Guilbert , supra, 306 Conn. at 236 n.11, 49 A.3d 705.

"Estimator variables are factors that stem from conditions over which the criminal justice system has no control and generally arise out of the circumstances under which the eyewitness viewed the perpetrator during the commission of the crime, such as lighting, distance or presence of a weapon." State v. Guilbert , supra, 306 Conn. at 236 n.11, 49 A.3d 705.

These estimator variables are (1) the eyewitness' level of stress at the time of observation, (2) whether a weapon was visible during the crime, (3) how long the event lasted, (4) the distance between the eyewitness and the defendant, and the lighting conditions, (5) witness characteristics, such as the use of alcohol or drugs, and age, (6) perpetrator characteristics such as the use of a disguise or a change in facial features after the crime, (7) the time that has elapsed between the crime and the identification, (8) whether the case involves a cross-racial identification, (9) the opportunity to view the perpetrator at the time of the crime, (10) the eyewitness' degree of attention, (11) the accuracy of the eyewitness' prior description of the perpetrator, and (12) whether the eyewitness expressed high confidence at the time of the identification before receiving any feedback. See State v. Henderson , supra, 208 N.J. at 291-92, 27 A.3d 872.

The Ramirez reliability factors include: "(1) [T]he opportunity of the witness to view the actor during the event; (2) the [witness'] degree of attention to the actor at the time of the event; (3) the [witness'] capacity to observe the event, including his or her physical and mental acuity; (4) whether the [witness'] identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly. This last area includes such factors as whether the event was an ordinary one in the mind of the observer during the time it was observed, and whether the race of the actor was the same as the observer's." (Internal quotation marks omitted.) State v. Ramirez , supra, 817 P.2d at 781.

It is not entirely clear whether the court in Hunt adopted the Ramirez framework as a matter of state constitutional law or state evidentiary law. Inasmuch as the court recognized that the question of whether an eyewitness identification resulting from an unnecessarily suggestive identification procedure was nevertheless reliable implicates the due process rights of the defendant; see State v. Hunt , supra, 275 Kan. at 813, 69 P.3d 571 ; and that Ramirez was based on the Utah constitution; see id., at 817, 69 P.3d 571 ; it is reasonable to conclude that Hunt is based on the Kansas constitution.
The state notes that the Supreme Court of Kansas later clarified that, in Hunt , it did not adopt the holding of Ramirez rejecting the assumption in Biggers that confidence supports the reliability of an identification for purposes of determining its admissibility. See State v. Mitchell , 294 Kan. 469, 478, 275 P.3d 905 (2012). The court in Mitchell , however, ultimately disapproved of jury instructions that prompted "the jury to conclude that an eyewitness identification is more reliable when the witness expresses greater certainty ...." Id., at 481, 275 P.3d 905. We find it difficult to reconcile the court's conclusions in Mitchell that (1) confidence is a proper consideration for the trial court when determining whether an identification is admissible, and (2) confidence is not a proper consideration for the jury when determining what weight to give to an identification.

The court in Lawson identified the following estimator variables: (1) whether the eyewitness was under a high level of stress; (2) whether the eyewitness was focusing his attention on the perpetrator; (3) the duration of the exposure; (4) viewing conditions; (5) witness characteristics such as visual acuity, physical and mental condition, and age; (6) the lack of correlation between the accuracy of a description and the ability to identify the perpetrator; (7) perpetrator characteristics, such as whether the perpetrator was wearing a disguise or whether he was of the same race as the witness; (8) the speed of the identification; (9) the lack of connection between the level of certainty and accuracy; and (10) the rate of memory decay. State v. Lawson , supra, 352 Or. at 744-46, 291 P.3d 673. The court indicated that this list of variables is not exclusive and might change as the result of ongoing scientific research. See id., at 741, 291 P.3d 673.

The court stated: "A constitutional due process analysis might properly consider suggestiveness as a separate prerequisite to further inquiry because the [d]ue [p]rocess [c]lause is not implicated [in the absence of] some form of state action, such as the state's use of a suggestive identification procedure.... As a matter of state evidence law, however, there is no reason to hinder the analysis of eyewitness reliability with purposeless distinctions between suggestiveness and other sources of unreliability." (Citation omitted.) State v. Lawson , supra, 352 Or. at 746-47, 291 P.3d 673.

We recognize that we stated in Guilbert "there is at best a weak correlation between a witness' confidence in his or her identification and its accuracy"; State v. Guilbert , supra, 306 Conn. at 237, 49 A.3d 705 ; whereas the court in Henderson concluded that there is a correlation between high confidence at the time of the identification, before receiving any feedback or other information, and accuracy. State v. Henderson , supra, 208 N.J. at 292, 27 A.3d 872. In our view, these statements are not inconsistent. Rather, Guilbert states the general rule and Henderson recognizes an exception to that rule. In any event, to the extent that this issue is the subject of ongoing scientific controversy, the parties may present expert testimony on the issue at the pretrial hearing and at trial in accordance with our opinion in Guilbert .

We note that, in 2011, the legislature enacted Public Acts 2011, No. 11-252, § 1, codified at General Statutes (Supp. 2012) § 54-1p, which sets forth the procedures that the police are required to use when conducting photographic arrays and live lineups. As we previously have explained, "[t]his statute demonstrates a clear legislative concern that suggestive identification procedures are a significant cause of erroneous convictions and should be eliminated to the extent possible."State v. Dickson , supra, 322 Conn. at 425 n.10, 141 A.3d 810. Raising similar concerns, the amici curiae, the Connecticut Innocence Project and the Innocence Project, argue that, for purposes of our state constitutional framework, any material violation of the identification procedures mandated by § 54-1p should render the identification inadmissible per se. We are not persuaded by this contention. If, despite the noncompliance with § 54-1p, the identification is deemed to be reliable under the expanded framework that we have adopted in this case, we can perceive no compelling justification for precluding its use by the state. We emphasize, however, that our conclusion that the parties are entitled to present expert testimony on factors affecting the reliability of an identification encompasses testimony on the corruptive effect of system variables. See State v. Henderson , supra, 208 N.J. at 293, 27 A.3d 872 ("[b]ecause both [system variables and estimator variables] can alter memory and affect eyewitness identifications, both should be explored pretrial in appropriate cases").