******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* EDWIN FRANQUI
## (SC 21073)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Bright, Js.

*Syllabus*

Convicted of murder, conspiracy to commit murder, assault in the first degree with a firearm, and criminal possession of a firearm in connection with a drive-by shooting, the defendant appealed to this court. The defendant's younger brother, Y, had been driving a vehicle from which the defendant fired gunshots toward another vehicle, killing its driver and wounding a passenger. The victim's girlfriend, O, who was a passenger in the victim's vehicle at the time of the shooting, identified the defendant as the shooter in statements to the police and at trial. On appeal, the defendant claimed, inter alia, that the trial court had committed plain error by failing to instruct the jury on eyewitness identification testimony in accordance with *State* v. *Ledbetter* (275 Conn. 534). *Held*:

The trial court's failure to instruct the jury on eyewitness identification testimony in accordance with *Ledbetter* was not an obvious and readily discernable error requiring reversal under the plain error doctrine because there was no significant risk of misidentification by the primary eyewitness, O, insofar as O was familiar with the defendant, Y, and the vehicle that they occupied at the time of the shooting.

This court declined to exercise its supervisory authority over the administration of justice to require trial courts to provide juries with the relevant portion of the specific eyewitness identification instruction (instruction 2.6-4) in the Connecticut model criminal jury instructions in any case in which good faith misidentification is at issue, as the defendant's theory of defense concerned O's untruthfulness rather than a good faith misidentification, and mandating such an instruction in all cases in which identification might conceivably be at issue could cause confusion among jurors.

For the reasons set forth in *State* v. *Franqui* (354 Conn. 400), the companion decision resolving the same claim in Y's appeal, this court declined to exercise its supervisory authority to abrogate the hearsay exception for spontaneous utterances.

Argued December 4, 2025—officially released April 21, 2026

*Procedural History*

Substitute information charging the defendant with the crimes of murder, conspiracy to commit murder, assault in the first degree with a firearm, and criminal possession of a firearm, brought to the Superior Court in the judicial district of Hartford, where the case was

tried to the jury before *Gustafson, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Laurie N. Feldman*, assistant state's attorney, with whom were *Sharmese L. Walcott*, state's attorney, *Michael W. Riley*, supervisory assistant state's attorney, and *Casey Flynn*, assistant state's attorney, for the appellee (state).

*Opinion*

**McDONALD, J.** This is the companion appeal to our decision today in *State* v. *Franqui*, 354 Conn. 400, A.3d (2026), arising from a drive-by shooting in Hartford committed by two brothers, both named Edwin Franqui. In this appeal, the defendant, Edwin Franqui, who was the shooter, challenges his conviction of, among other offenses, murder in violation of General Statutes § 53a-54a (a). He claims that the trial court committed plain error by failing to instruct the jurors about eyewitness identification testimony in accordance with *State* v. *Ledbetter*, 275 Conn. 534, 579–80, 881 A.2d 290 (2005) (overruled in part on other grounds by *State* v. *Harris*, 330 Conn. 91, 191 A.3d 119 (2018)), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006). The defendant also asks us to exercise our supervisory authority over the administration of justice (1) to require an eyewitness identification jury instruction in any case involving a contested identification, and (2) to abrogate the excited utterance exception to the rule against hearsay. We disagree with the defendant's plain error claim and decline his request to exercise our supervisory authority. Accordingly, we affirm the judgment of the trial court.

A detailed recitation of the underlying facts is set forth in our decision in the companion case. See *State* v. *Franqui*, supra, 354 Conn. 402–405, 413. Suffice it to

say that, on the afternoon of July 6, 2020, following an altercation the evening before with the victim, Junny Lara-Velazquez, the defendant and his younger brother (younger Franqui) were driving in the defendant's tan Infiniti, and they pulled up next to the victim's Honda Accord while both cars were headed westbound on Capitol Avenue in Hartford. The victim was driving his Honda and was accompanied by his girlfriend, Dayzani Ortiz, as well as her friend, Delymar Rios. With the younger Franqui driving the Infiniti, the defendant pointed a gun out of the passenger side window and fired several shots into the victim's Honda, first striking Rios in the buttocks. Although the victim had been ducking in the driver's seat, when Rios exclaimed from the back seat that she had been shot, the victim looked up and was then shot in the head by the defendant. Ortiz grabbed the steering wheel of the victim's Honda but could not control the vehicle because the victim's foot was still on the gas pedal, and the Honda crashed into a Subway restaurant located on Boulevard in West Hartford, near the intersection of Capitol Avenue and Prospect Avenue. Following the response of the police and emergency services to the crash, Ortiz told the first responding police officer that the defendant and the younger Franqui were responsible for the shooting and had been driving a tan Infiniti on Capitol Avenue.

The state charged the defendant with murder in violation of § 53a-54a (a), conspiracy to commit murder in violation of § 53a-54a (a) and General Statutes § 53a-48, assault in the first degree with a firearm in violation of General Statutes § 53a-59 (a) (5), and criminal possession of a firearm in violation of General Statutes (Supp. 2020) § 53a-217 (a). The trial court granted the state's motion to try the defendant's case to a jury jointly with that of the younger Franqui. The jury found the defendant guilty on all counts. The trial court rendered a judgment of conviction in accordance with the jury's verdict and sentenced the defendant to a total effective sentence of fifty years of imprisonment. The defendant

now appeals directly to this court. See General Statutes § 51-199 (b) (3).

I

The defendant first claims that the trial court's failure to give the jury an eyewitness identification instruction requires reversal under either the plain error doctrine or upon the invocation of our supervisory authority. He urges us to "require at least a basic identification instruction in every case where a good faith mistake is an issue, whether or not that instruction is requested."

A

We begin with the defendant's plain error claim. He first argues that the critical factual issue in this case was the reliability of Ortiz' identification of the defendant as the shooter, which was made both in statements to police officers and at trial. He then contends that specific eyewitness identification instructions akin to those discussed in *State* v. *Guilbert*, 306 Conn. 218, 246–48 n.27, 257–58, 49 A.3d 705 (2012), and those articulated in *State* v. *Ledbetter*, supra, 275 Conn. 579–80, as reflected in instruction 2.6-4 of the Connecticut model criminal jury instructions; see Connecticut Criminal Jury Instructions 2.6-4, available at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited April 15, 2026); were necessary to provide the jury with sufficient guidance to decide that issue because the "general credibility instruction is inadequate to properly guide the jury when good faith identification is a central issue."

In response, the state argues that the trial court's failure to give an eyewitness identification instruction was not plain error because *Guilbert* and *Ledbetter* concern types of identifications that are not at issue in this case, namely, those of strangers and those made during police presentations of a suspect. With respect to *Guilbert*, the state further contends that this court's holding in that case was discretionary in nature and that it concerned the admissibility of expert testimony, not

jury instructions. See, e.g., *State* v. *Brown*, 182 Conn. App. 112, 121 and n.7, 189 A.3d 127, cert. denied, 329 Conn. 913, 186 A.3d 1170 (2018). The state also argues that the defendant failed to demonstrate "grievous consequences" from the absence of eyewitness identification instructions because, for the same reasons that they are inapplicable as a matter of law, Ortiz knew the defendant well and immediately identified him to the police, and her identification was corroborated by other evidence, including the defendant's confession to Johanny Franqui, the defendant and the younger Franqui's other brother. See, e.g., *State* v. *Sanchez*, 308 Conn. 64, 79–80, 60 A.3d 271 (2013). We agree with the state.

It is undisputed that this instructional claim was not preserved at trial and that the trial court's instructions on this point were limited to witness credibility generally.[1] The defendant seeks review of this unpreserved claim

[1] The trial court provided the following instruction to the jury: "Number one, credibility. In deciding what the facts are, you must consider all the evidence. In doing this, you must decide what testimony to believe. You may believe all, none, or only some part of . . . a witness' testimony. In making that decision, you may consider several factors, including the following:

"One, was the witness able to see, or hear, or know the things about which that witness testified? Two, how well was the witness able to recall and describe those things? Three, what was the witness' manner while testifying? Four, did the witness . . . have an interest in the outcome of this case, or any bias or prejudice concerning any party or any matter involved in the case? Five, how reasonable was the witness' testimony considering all the evidence in the case? Six, was the witness' testimony contradicted by what that witness has said or done at another time, or by the testimony of other witnesses, or by other evidence?

"If you think that a witness has deliberately testified falsely in some respect, you should carefully consider whether you should rely upon any of that witness' testimony. In deciding whether to believe a witness, keep in mind that people sometimes forget things. You need to consider, therefore, whether a contradiction is an innocent lapse of memory or an intentional falsehood, and that may depend on whether the contradiction has to do with an important fact or with only a small detail.

"Now, these are some of the factors you may consider in deciding whether to believe testimony. The weight of the evidence presented does not depend on the number of witnesses. It is the quality of the evidence, not the quantity of the evidence, that you must consider."

under the plain error doctrine,[2] which "is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. . . . It is axiomatic that . . . plain error review is reserved for only the most egregious errors. . . . [I]t is not enough for the defendant simply to demonstrate that his position is correct. Rather, the party seeking plain error review must demonstrate that the claimed impropriety was so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal. . . .

"An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . [I]n addition to examining the patent nature of the error, the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. . . . Thus, we employ a two-pronged test to determine whether plain error has occurred: the defendant must establish that (1) there was an obvious and readily discernable error, and (2) that error was so harmful or prejudicial that it resulted in manifest injustice." (Internal quotation marks omitted.) *State* v. *Thorpe*, 353 Conn. 783, 788–89, 347 A.3d 159 (2025); see, e.g., *State* v. *Kyle A.*, 348 Conn. 437, 445–46, 307 A.3d 249 (2024); see also, e.g., Practice

_____

[2] The defendant does not seek review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). He acknowledges that this instructional claim is nonconstitutional in nature and, in any event, is subject to implied waiver under *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011). See, e.g., *State* v. *McClain*, 324 Conn. 802, 804–805, 808, 155 A.3d 209 (2017) (*Kitchens* does not bar reversal for plain error); *State* v. *Perez-Lopez*, 218 Conn. App. 555, 611, 293 A.3d 1 (citing cases holding that claims concerning jury instructions pertaining to eyewitness misidentification are not constitutional in nature), cert. denied, 348 Conn. 902, 301 A.3d 529 (2023).

Book §60-5. "Our review . . . with respect to whether to reverse a trial court's judgment under the plain error doctrine is plenary." *State* v. *Kyle A.*, supra, 446; see, e.g., *State* v. *Sanchez*, supra, 308 Conn. 79–80.

We begin with the first prong of the plain error analysis, namely, whether "an obvious and readily discernable error" occurred. (Internal quotation marks omitted.) *State* v. *Thorpe*, supra, 353 Conn. 789. Our interpretation of this prong is informed by a brief review of *Guilbert* and *Ledbetter*, two of the leading decisions from this court addressing the risks of eyewitness misidentifications. In *Ledbetter*, this court initially declined to adopt, under the Connecticut constitution, a higher standard for reliability with respect to unnecessarily suggestive lineup identifications than that embodied in the federal framework set forth in *Neil* v. *Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972) (*Biggers* factors),[3] and specifically rejected a requirement that the police provide a warning to the eyewitness that the suspect might not be present in the lineup. See *State* v. *Ledbetter*, supra, 275 Conn. 546–47, 569. But see *State* v. *Harris*, supra, 330 Conn. 114–15, 130–31 (overruling *Ledbetter* in part and concluding that due process provision of article first, §8, of our state constitution affords greater protection than federal constitution with respect to admissibility of eyewitness identification following unnecessarily suggestive eyewitness identification procedure). Bearing in mind social science research indicating the dangers of the "relative judgment process," the court then considered whether to invoke its supervisory

---

[3] "We refer to the current factors for consideration in determining whether an [otherwise suggestive] identification is reliable under the totality of the circumstances as the *Biggers* factors because they were first summarized by the United States Supreme Court in *Neil* v. *Biggers*, supra, 409 U.S. 199–200. [T]he factors to be considered . . . include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." (Internal quotation marks omitted.) *State* v. *Ledbetter*, supra, 275 Conn. 546 n.8.

authority over the administration of justice to employ various remedies for addressing eyewitness procedures that are unnecessarily suggestive. *State* v. *Ledbetter*, supra, 570–75.

This court declined to adopt "a per se rule deeming identification procedures that lack a warning to the witness concerning the potential absence of a suspect unnecessarily suggestive per se . . . ." Id., 575. The court nevertheless exercised its supervisory authority over the administration of justice "to require an instruction to the jury in those cases where the identification procedure administrator fails to provide such a warning, unless no significant risk of misidentification exists." Id. This invocation of supervisory authority reflected the court's balancing the value of eyewitness identification evidence as a "vital element in the investigation and adjudication of criminal acts" against the significant risks of misidentification by eyewitnesses. Id., 577–79.

Thus, the court held in *Ledbetter*: "[U]nless there is *no significant risk of misidentification*, we direct the trial courts of this state to incorporate an instruction in the charge to the jury, warning the jury of the risk of misidentification, in those cases where . . . **(1)** the state has offered eyewitness identification evidence; **(2)** that evidence resulted from an identification procedure; and **(3)** the administrator of that procedure failed to instruct the witness that the perpetrator may or may not be present in the procedure." **(Emphasis added; footnote omitted.)** Id., 579. Although the court "decline[d] to delineate all of the potential factual variations that might result in the trial court finding no significant risk of misidentification," it "note[d] that one example would be where the defendant was known by the witness before the incident occurred. The trial court should make its determination of whether a significant risk of misidentification exists on the basis of the totality of the circumstances." Id., 579 n.26.

Subsequently, in *Guilbert*, this court concluded that "expert testimony on eyewitness identification is

admissible upon a determination by the trial court that the expert is qualified and the proffered testimony is relevant and will aid the jury."[4] *State* v. *Guilbert*, supra, 306 Conn. 226. The court determined that expert testimony should be permitted given the development of consensus scientific findings with respect to the accuracy of eyewitness identifications that are both "unfamiliar" to the "average" layperson and "counterintuitive."[5] Id., 239. The court concluded that this "strong scientific consensus" demonstrates that "the methods traditionally employed for alerting juries to the fallibility of eyewitness identifications—cross-examination, closing argument and generalized jury instructions on the subject—frequently are not adequate to inform them of the factors affecting the reliability of such identifications." Id., 243.

The court reiterated in *Guilbert*, however, that "a trial court retains the discretion to decide whether, under the

[4] In so concluding in *Guilbert*, the court overruled *State* v. *McClendon*, 248 Conn. 572, 586, 730 A.2d 1107 (1999), and *State* v. *Kemp*, 199 Conn. 473, 477, 507 A.2d 1387 (1986). See *State* v. *Guilbert*, supra, 306 Conn. 226; see also id., 220–21.

[5] The court observed: "Courts across the country now accept that (1) there is at best a weak correlation between a witness' confidence in his or her identification and its accuracy, (2) the reliability of an identification can be diminished by a witness' focus on a weapon, (3) high stress at the time of observation may render a witness less able to retain an accurate perception and memory of the observed events, (4) cross-racial identifications are considerably less accurate than same race identifications, (5) a person's memory diminishes rapidly over a period of hours rather than days or weeks, (6) identifications are likely to be less reliable in the absence of a double-blind, sequential identification procedure, (7) witnesses are prone to develop unwarranted confidence in their identifications if they are privy to postevent or postidentification information about the event or the identification, and (8) the accuracy of an eyewitness identification may be undermined by unconscious transference, which occurs when a person seen in one context is confused with a person seen in another. This list is not exhaustive; courts have permitted expert testimony on other factors deemed to affect the accuracy of eyewitness identification testimony." (Footnotes omitted.) *State* v. *Guilbert*, supra, 306 Conn. 237–39; see also id., 242 (emphasizing that, "although there is little if any correlation between confidence and accuracy, an eyewitness' confidence is the most powerful single determinant of whether . . . observers . . . will believe that the eyewitness made an accurate identification" (internal quotation marks omitted)).

specific facts and circumstances presented, focused and informative jury instructions on the fallibility of eyewitness identification evidence of the kind contemplated by the New Jersey Supreme Court in [*State* v. *Henderson*, 208 N.J. 208, 219, 296–99, 27 A.3d 872 (2011)] . . . would alone be adequate to aid the jury in evaluating the eyewitness identification at issue. We emphasize[d], however, that any such instructions should reflect the findings and conclusions of the relevant scientific literature pertaining to the particular variable or variables at issue in the case; broad, generalized instructions on eyewitness identifications . . . do not suffice." (Citations omitted; footnote omitted.) *State* v. *Guilbert*, supra, 306 Conn. 257–58; see also *State* v. *Harris*, supra, 330 Conn. 134–35 (trial court may instruct jurors in accordance with factors outlined in *Guilbert* with respect to identifications that are product of unnecessarily suggestive procedures).[6]

We conclude that the defendant's claim fails under the plain error doctrine because there is no "obvious and readily discernable error . . . ." (Internal quotation marks omitted.) *State* v. *Thorpe*, supra, 353 Conn. 789. This case does not fall within the trigger of *Ledbetter* requiring an instruction to avert a "significant risk of misidentification . . . ." *State* v. *Ledbetter*, supra, 275 Conn. 579 n.26. Ortiz, after all, had been familiar with the defendant and the younger Franqui for several months prior to the incident. She also could have been expected to recognize the Infiniti that they were driving because it had been owned by the victim—her boyfriend—until he sold it to them the preceding week. Moreover, the car had a distinctive tinted windshield that made it even more likely that she would recognize it.

[6]The defendant asks us to depart from *State* v. *Guilbert*, supra, 306 Conn. 257–58, and to follow decisions from Alaska, Massachusetts, and New Jersey that, he argues, make eyewitness identification instructions mandatory. See *Young* v. *State*, 374 P.3d 395, 428–29 (Alaska 2016); *Commonwealth* v. *Gomes*, 470 Mass. 352, 365, 22 N.E.3d 897 (2015); *State* v. *Henderson*, supra, 208 N.J. 296. We are not persuaded and reaffirm the trial court's discretion in deciding whether to provide such instructions. See *State* v. *Guilbert*, supra, 257–58.

Given Ortiz' familiarity with the defendant, we conclude that the trial court's failure to instruct the jury on eyewitness identification was not "an obvious and readily discernable error . . . ." (Internal quotation marks omitted.) *State* v. *Thorpe*, supra, 353 Conn. 789. Having determined that the defendant cannot succeed under the first prong, we need not reach the second prong of the plain error analysis. See, e.g., id., 793 n.8. Accordingly, we find no plain error.

B

Emphasizing that eyewitness misidentifications are the leading cause of wrongful convictions; see, e.*g.*, *Tatum* v. *Commissioner of Correction*, 349 Conn. 733, 736–37, 757–58, 322 A.3d 299 (2024); the defendant next asks us to exercise our supervisory authority over the administration of justice to require that "relevant portions of instruction 2.6-4 [of the Connecticut model criminal jury instructions] be given in any case where good faith misidentification is at issue." In response, the state contends that we should not exercise our supervisory authority because the defendant's proposed rule would not apply in this case, which concerns a defense of untruthfulness or fabrication rather than good faith misidentification. To this end, the state argues that mandating this instruction in all cases in which identification might conceivably be at issue would risk confusing juries. We agree with the state and decline to exercise our supervisory authority in this case.

"Supervisory authority is an extraordinary remedy that should be used sparingly . . . . Although [a]ppellate courts possess an inherent supervisory authority over the administration of justice . . . [that] authority . . . is not a form of free-floating justice, untethered to legal principle. . . . Our supervisory powers are not a last bastion of hope for every untenable appeal. They are an *extraordinary* remedy to be invoked only when circumstances are such that the issue at hand, [although] not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity

of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Constitutional, statutory and procedural limitations are generally adequate to protect the rights of the [litigant] and the integrity of the judicial system. Our supervisory powers are invoked only in the rare circumstance [in which] these traditional protections are inadequate to ensure the fair and just administration of the courts. . . . Overall, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers . . . . Thus, we are more likely to invoke our supervisory powers when there is a pervasive and significant problem . . . or when the conduct or violation at issue is offensive to the sound administration of justice . . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.) *In re Aisjaha N.*, 343 Conn. 709, 724–25, 275 A.3d 1181 (2022); see also, e.g., *State* v. *King*, 350 Conn. 303, 335–36, 324 A.3d 81 (2024) (discussing circumstances in which supervisory authority rules are applied prospectively and thus do not require reversal of judgment). "This demanding standard is perfectly appropriate when we are asked to reverse a conviction under our supervisory powers." *State* v. *Carrion*, 313 Conn. 823, 851, 100 A.3d 361 (2014).

We decline to exercise our supervisory authority to mandate an eyewitness identification instruction in *all* cases in which there is a challenged eyewitness identification. Cases similar to the present one, which involve eyewitnesses who are familiar with the defendant, may turn more on the credibility of the witness than the scientific principles governing the accuracy of the identification, meaning that such instructions could be distracting and confusing to the jury. See, e.g., *State* v. *Rodriguez*, 337 Conn. 175, 197, 252 A.3d 811 (2020) (declining to exercise supervisory authority to require jury instruction on DNA random match probability when that would not have fully explained statistical method used in case, and when there was evidence other than DNA evidence identifying defendant as perpetrator). Although eyewitness identification instructions may well be advisable

in many cases, we decline to impose a blanket rule that removes discretion from the trial court with respect to tailoring the instructions to the issues as litigated by the parties. See, e.g., id., 198 n.14 (discussing trial court's discretion to instruct jury with respect to scientific facts that contradict "common misperceptions" about eyewitness identification in emphasizing court's discretion, "in appropriate circumstances, and when the defendant requests it, [to instruct] the jury on the meaning of the statistical rarity of a [DNA] match"); see also, e.g., *State* v. *Christopher S.*, 338 Conn. 255, 299–300, 257 A.3d 912 (2021) (declining to "require trial courts to give a special instruction in every case in which the police fail to record custodial interrogations" but emphasizing "the trial court's discretion to give a specific, cautionary instruction when the police fail to record a custodial interrogation in violation of [General Statutes] § 54-1o (b)"); *State* v. *Diaz*, 302 Conn. 93, 109, 113–14, 25 A.3d 594 (2011) (declining to exercise supervisory authority to extend rule from jailhouse confessions to require special credibility instruction "whenever a witness is in a position to receive a benefit from the government" in part because trial court's existing authority to comment on evidence accommodates situations in which witness' testimony appears "particularly unreliable").

II

The defendant next claims that the trial court improperly admitted Ortiz' statement to the first responding police officer under the excited utterance exception to the hearsay rule. In support of this unpreserved claim, the defendant argues that we should abandon the excited utterance exception, which is presently codified at § 8-3 (2) of the Connecticut Code of Evidence. He contends that the excited utterance exception is based on "bad folk psychology" and, therefore, lacks scientific validity to establish the reliability of such statements.

For the reasons set forth in the companion decision resolving this same claim in the younger Franqui's appeal, we decline to exercise our supervisory authority

to abrogate the excited utterance exception to the hearsay rule. See *State* v. *Franqui*, supra, 354 Conn. 412–18.

The judgment is affirmed.

In this opinion the other justices concurred.